# Richmond

GUSTAVIA WADE, ADMINISTRATRIX OF HARVEY WADE, DE-
CEASED V. THE CHESAPEAKE & OHIO RAILWAY COMPANY.

November 11, 1937.

Present, Campbell, C. J., and Holt, Gregory, Browning,
Eggleston and Spratley, JJ.

450

The opinion states the case.

*S. P. Conrad* and *Conrad & Conrad,* for the plaintiff in error.

*J. M. Perry,* for the defendant in error.

CAMPBELL, C. J., delivered the opinion of the court.

This action by notice of motion was brought by Gustavia Wade, administratrix of Harvey Wade, deceased, against the defendant, The Chesapeake and Ohio Railway Company, to recover damages for the death of the plaintiff's intestate, caused, as alleged in the notice of motion, by the negligence of the defendant company.

There was a trial by a jury, which resulted in a verdict for the plaintiff. Upon the motion of the defendant, the trial court set aside the verdict of the jury and entered final judgment in favor of the defendant.

The defendant, a common carrier, owns and operates a branch-line railway running from Hot Springs, Virginia, its western terminal, to Covington, Virginia, its eastern terminal. The train which struck and killed Wade consisted of a locomotive and tender and a combination baggage and express coach, and was proceeding from Hot Springs to Covington.

The accident occurred on the evening of June 8, 1934, at approximately seven forty-five o'clock. The point of the accident was placed by one witness for the plaintiff at forty-six feet, and by another witness for the plaintiff at one hundred and fifty feet west of a crossing approximately three and a half miles from Hot Springs. Wade, who had entered upon the railway track at the crossing, was proceeding in the same direction as the train, which, when he was first observed by the fireman, was coasting down grade at a rate of speed of about thirty miles an hour. The railroad approach to the crossing is, from a practical view-

point, virtually straight until a point is reached, three hundred and seventy-two feet west of the crossing, where a slight curve begins, which, in turn, enters into a sharp curve. Until this latter point is reached by the engine, the view of the engineer is obscured by the curvature but the view of the fireman is unobstructed for a distance of seven hundred feet before reaching the crossing, and for a distance of one hundred and thirty feet beyond the crossing. At a point fourteen hundred and seventy-two feet west of the crossing a whistle post is stationed. It is uncontroverted that the automatic bell upon the engine was set in motion at the whistle post and continued to ring until Wade was struck by the engine. It is also shown that the proper whistle signal was given for the crossing. It was while the whistle was being blown that the fireman first observed Wade upon the track, walking between the rails. Immediately upon observing Wade, the fireman called to the engineer, "Man on the track." Thereupon, before completing the crossing signal, the engineer blew the danger signal and continued so to do until the moment of impact.

The engineer and fireman were the only eye-witnesses to the accident and they were introduced by the plaintiff as adverse witnesses.

The evidence of Gleason, the fireman, may be thus summarized: At a point seven hundred feet from the crossing he saw Wade at a distance of one hundred and thirty feet beyond the crossing, walking between the rails, with his back to the engine; he did not "see anything unusual in his walk;" if Wade staggered, he did not observe it; Wade was walking just as any other person would walk; upon observing Wade, he called to the engineer, "Man on the track," and repeated the statement between blasts of the whistle.

H. D. Wise, the engineer, testified, in substance, as follows: He was the engineer in charge of the train which struck Wade; as the train approached the grade-crossing it was coasting down grade at a rate of speed between

twenty and thirty miles an hour; during the period in which the crossing signal was given the fireman called to him, "Man on the track;" he immediately gave the signal and made a service application of the airbrakes; the curvature in the track obscured his view and he did not see Wade until the train was two hundred feet from the crossing; Wade was then approximately one hundred and thirty feet beyond the crossing; Wade "just kept on at the same gait, he did not seem to move off the track at all, but continued walking;" he thought Wade would get off the track and when he realized Wade was not paying any attention to the "blowing" he applied the emergency brakes; the speed of the train was reduced to "about" twenty-two miles an hour; the danger signal was given until the moment of impact; after realizing Wade did not heed the danger signal, he did everything in his power to avoid the accident; if the emergency brakes had been applied in the first instance, the accident could not have been avoided, as a stop within a distance of one thousand feet "would have been a good stop." Wise further testified that Wade "was walking natural, like a man would walk on the ties;" that he was not staggering "but kept on from first to last at about the same gait."

The plaintiff, as shown in her notice of motion for judgment, bases her right of recovery upon the allegation that Wade, at the time of the accident, was in such a state of intoxication that he was unconscious of his danger and his condition was known, or, in the exercise of ordinary care, should have been known to the defendant; also, on the further allegation that in the exercise of ordinary care, after the discovery of Wade upon the track, walking between the rails, the defendant failed to use the facilities which were at hand, and, in order to avoid the accident, to exercise such care as was consistent with its duty to the passengers upon the said train. To support the allegation that Wade was visibly staggering from the effects of his intoxicated condition when the fireman first perceived him upon the track, the plaintiff introduced several witnesses

who testified as to Wade's condition a short time prior to the accident.

It must be conceded that from this evidence the jury was warranted in finding that Wade did evince signs of intoxication and did at times "stagger" a short time prior to his entry upon the railroad. However, we are unable to concur in the conclusion that Wade was, in contemplation of law, in a helpless condition as he walked along the highway. The evidence is conclusive that as he approached the railroad track he talked intelligently to several of his acquaintances; that he was cognizant of the direction in which he was going and that he was aware of his destination, which was the home of his son-in-law. It is shown that at no time did he fall to the ground as a result of his intoxication. It is also shown by the evidence that the witnesses were not in accord in regard to the manner of his "staggering" or the length of time thereof.

The action of the court in setting aside the verdict of the jury and entering final judgment for the defendant is assigned as error.

The legal principles governing the case at bar are, in our opinion, well defined. It was conceded by stipulation of counsel that Wade was a licensee. What, then, were the primary rights and duties of Wade and the defendant? This question is conclusively answered by Judge Burks in *Gunter's Adm'r* v. *Southern Railway Co.*, 126 Va. 565, 101 S. E. 885, 891, as follows:

"It has been held time and again by this court that it is the duty of railroad employees to keep a lookout for licensees, and when discovered to be in peril, to do all in their power, consistent with their duty to others, to avoid inflicting an injury upon them. The very fact that a person is a licensee charges the employees of the company with the duty to look out for him, and the object of the lookout is to give warning of danger so as to avoid injury to him. As soon as a person steps on the track he is in a place of danger. The track itself is a physical proclamation of danger, and he is required, even at a public crossing, to look in

both directions and to listen before entering upon it. The nearer a train approaches one upon the track, the greater the danger, and when it reaches that point where it is necessary for him to leave the track quickly to avoid a collision he is in peril, and if he still remains on the track and is killed, there is a calamity. It is the perilous condition of the licensee of which he is entitled to be *warned*. If, with the equipment at hand, this warning can be given, it must be, and the failure to give it is negligence.

   *   *   *   *   *   *   *

  "But whatever may have been the prior holdings, we are of opinion that when the engineman or other person in charge of a moving engine or car *sees* a person in apparent possession of his faculties on the track, or so near thereto that he will probably be injured or killed unless he changes his position, he has the right to assume that he will change his position in time for his own safety until the approach is so close that an engineman of ordinary care and prudence would be admonished of his peril, and if he then gives no evidence of consciousness of his peril it is the duty of such engineman or person in charge to give timely and suitable warning of the approach of such engine or car, and if the warning appears to be unheeded to use all other means within his power, consistent with his higher duty to other persons, to avoid injury to one who has thus exposed himself. * * * If a person is on the track and in an apparently helpless condition, mere warning is not sufficient because it would be useless, but the servants operating the engine or car must use all the means within their power, consistent with their higher duty to others, to avoid injuring him, after discovering his perilous position, or if he be one to whom the duty of lookout is owing, after they should have discovered it. *Seaboard R. Co.* v. *Joyner's Adm'r*, 92 Va. 354, 23 S. E. 773."

This decision follows the case of *Southern Railway Co.* v. *Bailey*, 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379, and reiterates the doctrine announced in that case.

In rebuttal of the evidence of the engineer, that the train could be stopped in less than a thousand feet, plaintiff proved that after the accident the train was brought to a stop in a distance of four hundred and forty feet. In view of this evidence, we adopt the theory of plaintiff in regard to the distance required to stop the train.

It appears that when the engine reached a point seven hundred feet west of the crossing, Wade was one hundred and thirty feet east of the crossing, making the distance between them over eight hundred feet. It is, therefore, contended that since the train could be stopped in four hundred and forty feet, it was the duty of the fireman, in the exercise of ordinary care, to realize that Wade was in a helpless condition and could only be saved by the stopping of the train. The lowest estimate of the speed of the train while traveling the aforementioned distance of eight hundred and thirty feet was twenty miles per hour, or twenty-nine and one half feet per second. Therefore, thirteen seconds (in round numbers) would have been required to travel the first three hundred and ninety feet of the distance. It was during this brief period of time that plaintiff claims the fireman should have observed Wade's condition, his apparent unconsciousness of danger, notified the engineer of Wade's predicament and had him take steps to stop the train.

There is no claim by plaintiff that Wade's helpless condition was indicated in any manner save by his visible "staggering," which brings us to a consideration of the determinative question in the case, viz: Did the jury have the right to infer from the evidence adduced in regard to Wade's intoxicated condition prior to his entry upon the track, that such a condition continued to exist during the period of thirteen seconds when Wade was in view of the fireman?

The doctrine invoked by the plaintiff as applicable to the instant case combines the right of recovery upon an inference of continued intoxication with the element of the

last clear chance to avoid the injury after discovery of Wade's perilous situation.

The rule is settled that a jury can not base an inference upon a presumption; that an inference cannot be founded upon a presumption, but must be founded upon some fact legally established. *Virginia Iron, etc., Co.* v. *Perkey's Adm'r,* 143 Va. 168, 130 S. E. 403; *Southern Railway Co.* v. *Hall's Adm'r,* 102 Va. 135, 139, 45 S. E. 867; *C. & O. Ry. Co.* v. *Heath,* 103 Va. 64, 48 S. E. 508; *Virginia Iron, Coal & Coke Co.* v. *Hughes' Adm'r,* 118 Va. 731, 740, 88 S. E. 88; *C. & O. Ry. Co.* v. *Ware,* 122 Va. 246, 254, 95 S. E. 183.

In view of the uncontradicted evidence of the engineer and fireman that Wade did not stagger when observed by them, the inference invoked by the plaintiff is based upon a presumption and not founded upon a fact legally established.

In order for plaintiff to recover, it will not suffice to presume that Wade indicated his intoxicated condition at some period during his progress along the track, but it must appear from an inference based upon some fact proven in the case that Wade, when first observed by the fireman, was in an intoxicated condition and that this condition was evinced by staggering. In our opinion the inference relied upon is based upon a presumption, or conjecture, and not upon some fact established by the evidence.

The first assignment of error is without merit.

The second assignment of error relates to the refusal of the trial court to permit the witness Henry Riner to testify, as an expert, within what distance the train involved could have been stopped in time to have avoided the accident by the application of the service and air brakes.

This question was asked the witness:

"Q. Mr. Riner, assuming this train on the C. & O. Railroad consisted of two Pullman cars and one combination car, and the engine and tender, of course, and it was a G-7 type of engine, was equipped with air brakes and independent engine brake, and a device for sanding the track,

and a device for reversing the engine. Within what distance would you say that train could be stopped on a grade there of 1 8/10 per cent, within what distance would you say that train could be stopped, assuming first that the speed was 30 miles per hour?"

The defendant objected to the question on the ground that it must first be shown that the witness is possessed of technical knowledge of the subject matter, and that his answer is based upon his experience in the operation of cars and engine of similar construction and equipment, and under like circumstances.

In *Wise Terminal Co.* v. *McCormick,* 104 Va. 400, 51 S. E. 731, 734, it is said:

"The speed at which a train was moving or within what distance it could be stopped are questions of actual fact, and expert testimony thereon can, under no circumstances, be introduced unless based upon the operation of cars or engines of similar construction and equipment, and under like conditions. *Richmond Passenger & Power Co.* v. *Racks' Adm'r,* 101 Va. 487, 44 S. E. 709."

The objection of the defendant is well founded. The statement of Riner in the absence of the jury demonstrates his lack of qualification. In substance, his statement is as follows: His experience in the operation of standard-gauge engines, equipped with air brakes, extended over a four and a half year period; such operation of trains was prior to 1909; he had never operated a passenger train but only coal-carrying trains; he had never operated a train over the line of railway from Hot Springs to Covington; the only tests he had ever made in regard to the distance in which a train could be stopped were upon the line of railway of the Louisville and Nashville and the Norfolk and Western railways; these tests were made near Appalachia, Virginia, and Ramsey, Virginia, in Wise county; that the train consisted of an engine, a tender, seven cars and a caboose; the test was made on a grade, in each case, of one and one-half per cent, and a half of one per cent, respectively; the trains

did not carry Pullman cars; and he was not familiar with the type of engine in question.

There is no error in the judgment complained of and it is affirmed.

*Affirmed.*