ABRAHAM W. GOOSE, Plaintiff, Appellee and Appellant, *v.* HILTON HOTELS INTERNATIONAL, INC. ET AL., Defendants, Appellants and Appellees.

No. 11804. Argued May 7, 1956.—Decided June 29, 1956.

*Bolívar Pagán, Francisco Ponsa Feliú* and *Luis Blanco Lugo* for appellants and appellees. *F. Fernández Cuyar* and *Luis Tirado Géigel* for appellee and appellant.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

On March 20, 1951, Abraham Goose, a guest at the Caribe Hilton Hotel in San Juan, was injured when he slipped and fell on a stairway located on the premises of the hotel. Goose filed suit in the Superior Court against Hilton Hotels International, Inc., which operates the hotel, and the Commercial Casualty Insurance Co., Inc., for his injuries. Both parties have appealed from the judgment of the trial court awarding the plaintiff $7,500 for his injuries and $300 for medical expenses, totalling $7,800.

In their appeal the defendants argue that the trial court erred (*a*) in holding that the hotel was negligent and (*b*) in not holding that the plaintiff was contributorily negligent.

This makes it necessary to set forth briefly the manner in which the accident occurred.

The plaintiff and his friend, John J. Flemm, who shared a room with the plaintiff, were the only witnesses as to how the accident occurred. The defendants did not dispute their testimony and accept the trial court's findings of fact with respect thereto. The only evidence offered by the defendants was the testimony of (1) a physician who examined the plaintiff prior to the trial, (2) a civil engineer, and (3) an employee of the hotel as to the condition of the stairway.

Guests dressed in bathing suits who wished to use the swimming pool were required by the hotel to proceed by the service elevator to the basement and then to ascend a stairway to the patio where the swimming pool is located. The stairway, which has 12 steps, is constructed at a 30 degree angle and is 6 feet 8-½ inches wide. Each stair is 11-½ inches wide with a 6-inch riser. The steps are made of cement, divided into 2-inch squares, separated by grooves. These grooves helped to drain the steps of excess water; they also served to make the steps somewhat safer for the guests. However, at the time of the accident there was a 3-inch nosing of smooth cement at the edge of each step. The stairway had a single handrail on the right side, going in the downward direction. There was a concrete wall on each side of the stairway. The steps were usually wet from the rain and the traffic of bathers going to and from the pool.

About 11 a.m. Goose and Flemm went to the pool by using the service elevator and the stairway. After they had taken a swim and sat in the sun for awhile, they started to return to their room. When Goose approached the stairway, Flemm was behind him. As Goose started down the steps, appproximately 6 persons, including 2 children, were coming up the stairway on the side where the handrail was located. Goose started down the center of the stairway, moving toward the left wall, where there was no handrail, to avoid colliding

with the persons who were ascending on the other side where the handrail was located. Goose slipped on the wet, smooth nosing of the third or fourth stair, grabbed unsuccessfully for the wall on which he burned his forearm and chest and rolled down the rest of the stairs, thereby receiving the injuries involved herein.

 Goose was of course an "invitee" of the hotel. "The possessor is not an insurer of the safety of business visitors, and his duty extends only to the exercise of reasonable care for their protection. There is no liability for harm resulting from dangerous conditions of which he does not know, and which a reasonable inspection would not have discovered, *or from conditions from which no unreasonable risk was to be anticipated*. Likewise, in the usual case, there is no obligation to protect the visitor against dangers which are known to him, *or which are so apparent that he may reasonably be expected to discover them and be able to protect himself*...The visitor is entitled, however, to assume that proper care has been exercised to make the premises safe for him, and he is not required, as in the case of a licensee, to be on the alert for possible defects." (Italics ours). Prosser on *Torts*, § 79, p. 642; *id.*, 2d ed., § 78, p. 459, citing recent cases; *Gutiérrez* v. *Bahr*, 78 P.R.R. 451; *Shaubell* v. *Bennett*, 252 P. 2d 927 (Kans., 1953); *Coston* v. *Skyland Hotel*, 57 S.E. 2d 793 (S.C., 1950); *Harral* v. *Kent Corporation*, 212 P. 2d 356 (Kans., 1949); cases collected in 28 Am.Jur. pp. 578–81, 38 *id.*, 754–58, 43 C.J.S. § 22, p. 1176 *et seq.* *Cf.* Annotation, 27 A.L.R. 2d 822. Whether liability exists under the principles just enunciated depends on the facts and circumstances of each case.

 The hotel would not be liable if Goose, due to his own lack of care, had slipped and fallen on an ordinary flight of stairs. But here the plaintiff was compelled to use this stairway to reach the swimming pool; the stairs were normally wet; and the stairway was too wide to permit people going both ways to use the single handrail. It might

therefore be argued that under these circumstances the stairway, equipped with only one handrail, was unreasonably dangerous.[1] However, we need not determine whether the foregoing would be sufficient to establish the negligence of the hotel. There is an additional factor which made these wet and narrow steps—without the assistance of a handrail—almost a trap for a fifty-year old guest like the plaintiff; namely, the 3-inch *smooth* cement nosing at the edge of each stair.

■■ We agree that if the plaintiff had waited until the stairway was clear and had grasped the handrail while descending the stairway, the accident might not have occurred. But the hotel in effect invited him to go down the stairs without the aid of a handrail by placing only one handrail on a comparatively broad stairway with people constantly going up and down. The plaintiff was therefore entitled to expect that the steps themselves—which the hotel was in effect representing as safe to use without a handrail—would not contain any intrinsically dangerous features. The hotel could have provided such obvious safeguards as handrails on both sides, rough cement or grooved squares covering the *entire* surface of each stair, or rubber matting, see footnote 1. Instead, it placed a 3-inch nosing of smooth and uncovered cement on the edge of each of these narrow stairs. The nosing—due to the fact that it was always wet—constituted a potential threat to the safety of a mature person who, in descending on the side of the broad stairway on which no handrail was located, would normally place the ball of his foot precisely on this smooth and wet nosing. The hotel—in violation of the above-quoted rule laid down by Prosser—created a condition from which an "unreasonable risk was to be anticipated."

---

[1] The employee of the hotel testified that a second handrail had been ordered prior to the accident but had not yet been installed because the hotel—which opened one year and 3 months before the accident—had not yet gotten around to installing it. Subsequently, the second handrail was installed and the stairs were covered with rubber matting.

█ It is true that the smooth nosing would be visible to one whose attention was specifically directed to it. But that does not exculpate the defendant from liability *under the circumstances of this case*. Bathers would not normally expect narrow steps which were usually wet to have a smooth nosing. And—applying the aforesaid test laid down by Prosser—the smooth nosing was not "so apparent that . . . [the plaintiff might] reasonably be expected to discover" it, particularly as the plaintiff—a business visitor—was not required "to be on the alert for possible defects." It follows that despite the fact that on close inspection the smooth nosing could be observed, the latter—coupled with the lack of a handrail on both sides of the stairway—must be characterized as unreasonably dangerous, since a guest walking along in ordinary course was not likely to observe the nosing. James, *Tort Liability of Occupiers of Land: Duties Owed to Licensees and Invitees*, 63 Yale L. J. 605, 625–26.[2] The conclusion is inevitable that the plaintiff was injured as a result of the negligence of the hotel.

---

[2] "The customer in a store, for instance, generally expects that the aisles and passage ways open to customers are free from obstructions, pitfalls, and *slippery spots*. Since this is so, clearly visible conditions may often be unreasonably dangerous to the customer because he is in fact not likely to observe them." James, *supra*, p. 625, footnote 118, and cases cited (Italics ours); Restatement, *Torts* § 343, Comments *d* and *e; id.*, § 893; Keeton, *Personal Injuries Resulting from Open and Obvious Conditions*, 100 U.Pa.L.Rev. 629, 635, 639, 642–45; James, *Assumption of Risk*, 61 Yale L. J. 141, 161; cases collected in 5 N.C.C.A. 3d 246 (1955); *Knight* v. *Moore*, 18 S.E. 2d 266, 270 (Va., 1942); *Williamson* v. *Derry Electric Co.*, 196 Atl. 265 (N.H., 1938). See *Palmer* v. *Barreras*, 73 P.R.R. 266. *Cf. Conde* v. *New York Department Store*, 71 P.R.R. 175. Cases like *Walker* v. *Broad & Walnut Corporation*, 182 Atl. 643 (Pa., 1936) and *Ward* v. *Horn & Hardart Baking Co.*, 62 A. 2d 97 (Pa., 1948), on which the defendants rely, are distinguishable because in them the plaintiffs could in ordinary course easily observe the dangerous condition and were therefore contributorily negligent.

We need not determine if this case fell under the rule that " . . . the condition of danger is such that it cannot be encountered with reasonable safety even if the danger is known and appreciated." James, *supra*, p. 626; Prosser on *Torts*, 2d ed., p. 462. It is enough to say that under the facts of this case the plaintiff could not be expected to observe and realize his danger from the smooth nosing.

What we have said on the issue of the hotel's negligence also disposes of the contention that the plaintiff was guilty of contributory negligence. As already noted, the plaintiff was in effect invited by the hotel to use the stairway without the assistance of a handrail. And he was entitled to assume that the stairs could be safely used without a handrail. He was therefore not required to stop and inspect the stairs closely in order to discover the smooth nosing. See authorities cited in footnote 2 and text of opinion preceding it; *Montgomery Ward & Co.* v. *Snuggins*, 103 F.2d 458, 463 (C.A. 8, 1939); *Ritter* v. *Norman*, 129 Pac. 103 (Wash., 1913); *Sokolsky* v. *Feigen*, 49 So. 2d 88 (Fla., 1950); *Swift & Co.* v. *Schuster*, 192 F.2d 615 (C.A. 10, 1951); *Just* v. *Moreno*, 63 P.R.R. 647, 653; *Ramírez* v. *Hotel Condado*, 68 P.R.R. 880. It follows that the plaintiff's conduct in going down the steps without using the handrail and without ascertaining the smooth nosing on the edge of each stair did not constitute contributory negligence.

The defendants also argue that the plaintiff was contributorily negligent because he did not go down the steps by first placing the heel of his foot on the inside portion of each stair, which consisted of 2-inch squares divided by grooves. But the hotel's own witness, the engineer, conceded and we agree that this would not be the normal way a person would descend a stairway. And, as already noted. the plaintiff could not be expected to know that the nosing was so dangerous that it required such an unusual method of walking. Indeed, we think this is a self-defeating argument: by making it the defendants go a long way toward admitting that the hotel had negligently confronted the plaintiff with a dangerous situation when it required him to use a stairway in this condition.[3]

---

[3] The defendants cite a number of cases on the questions of negligence and contributory negligence. We have examined them, but see no purpose in distinguishing them in detail. They either involve different facts, on careful analysis are in accord with our views here, or state principles which we are not disposed to follow.

■ The trial court failed to include in its findings of fact and conclusions of law specific statements with reference to the issue of contributory negligence, which was raised in the defendants' answer. The latter contend that under the rule laid down in *American Surety Co.* v. *Izquierdo*, 75 P.R.R. 247, and *Darder* v. *Bayamón Truck Service*, 72 P.R.R. 74, we should remand the case for a specific finding and conclusion on this issue. But in those cases we took that action because under all the testimony in the case the possibility was not precluded that the defendant might have been guilty of contributory negligence. Here we have concluded from the *undisputed* evidence that we could not find that the plaintiff was guilty of contributory negligence. It would therefore be pointless to return the case for a finding thereon.[4]

■ Finally, the defendants contend that the judgment is excessive. We shall not engage in the profitless task of comparing this case with others in which we have affirmed or modified judgments of the Superior Court involving different injuries. We find nothing in the record which would justify interfering with the discretion of the trial court in fixing the amount of the damages in this case. *Cf. Conjugal Partnership, etc.* v. *Cruz*, 78 P.R.R. 335; *Baralt* v. *Báez*, 78 P.R.R. 115.

■ In his appeal the plaintiff contends that the trial court erred in not awarding him (a) $8,000 for loss of salary during 4 months and (b) attorney's fees. The plaintiff testified that he had "missed" 4 months from "his work" as a result of his injuries and that his salary from 2 corporations was about $2,000 a month. At this point the trial court intervened, stating that loss of earnings had not been specifically alleged. Counsel for the plaintiff argued that such damages need not be specifically alleged, to which the trial court replied: "But it would constitute surprise; the

---

[4] Since there was no contributory negligence here, we do not reach the question of the applicability to this case of Act No. 28 of June 9, 1956, amending § 1802 of the Civil Code, 31 L.P.R.A. § 5141.

general rule is that loss of earnings are special damages." Counsel for the plaintiff thereupon desisted from this line of questioning and the defendants did not cross-examine or present any evidence as to loss of earnings.

The trial court erred in not permitting the plaintiff to show loss of earnings. The complaint alleges that "[t] he plaintiff is a business man, being President of Pacific Smelting Co. of Cambridge, Mass. and a stockholder and director of Cambridge, Smelting Co., in the same city, and in addition to having caused him great physical suffering and mental anguish, said injuries have resulted in annoyances, inconveniences and *interruptions in the normal and ordinary course of his business and activities.*" (Italics ours). We have held that similar allegations are sufficient under Rules 9(g) and 8(f) of the Rules of Civil Procedure to justify introduction of evidence showing loss of earnings as an item of damages in a suit for personal injuries. *Prado* v. *Quiñones,* 78 P.R.R. 309; see *Betances* v. *Transportation Authority,* 73 P.R.R. 215.

However, as counsel for the plaintiff conceded at the oral argument, we cannot at this time include in our judgment any amount for loss of earnings, in view of the fact that the action of the trial court in cutting off testimony on this question prevented both parties from adducing their testimony and cross-examining the other party's witnesses. The case will therefore have to be remanded for additional testimony and a decision on the issue of loss of earnings.

Due to the fact that the trial court stopped the testimony on the subject, the record is not clear as to whether the 2 corporations continued to pay salaries to the plaintiff while he was not rendering services. The defendants argue that if the plaintiff received his salaries during the 4 months in question, he is not entitled to recover damages therefor. They contend that otherwise the plaintiff will be unjustly enriched; that if any claim for such salaries exists, it belongs

to the corporation which paid the plaintiff without receiving any services; and that a defendant is required only to place the plaintiff as nearly as possible in the condition he would have occupied if the wrong had not been committed. Accordingly, although they cite no cases agreeing with them, the defendants urge us to reverse *Reyes* v. *Aponte*, 60 P.R.R. 867, 873; *Pereira* v. *Commercial Transport Co.*, 70 P.R.R. 609, 613, which are contrary to their contention.

After re-examining the question, we adhere to our holdings in the *Reyes* and *Pereira* cases. We recognize that normally the law awards compensation, and no more, in personal injury cases. But the general rule, with which we agree, is that " . . . an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer." *Hudson* v. *Lazarus*, 217 F.2d 344, 346 (C.A. D.C., 1954); *Campbell* v. *Sutliff*, 214 N.W. 374 (Wis., 1927); *Clark* v. *Berry Seed Co.*, 280 N.W. 505 (Iowa, 1938); *Restatement, Torts*, § 920, Comment *e*; *Note*, 63 Harv.L.Rev. 330. *Contra, Daniels* v. *Celeste*, 21 N.E. 2d 1 (Mass., 1939). An employer who pays an employee his salary even though the latter renders no service therefor is in effect making a gift to him. Since the gift is intended to be made to the injured person and not to the tortfeasor, its benefits should inure to the former rather than to the latter. *Restatement, Torts* § 924, Comment *f*.[5]

■ The other question raised by the plaintiff's appeal is whether the trial court erred in not awarding attorney's fees to the plaintiff. We think the policy of awarding at-

---

[5] The plaintiff testified that he "missed" 4 months from "his work" because of his injuries. The defendants are entitled, if they choose, on remand to inquire into whether the plaintiff, despite the fact that he "missed" 4 months from "his work", rendered all or some of his customary services to the corporation during that period. Under the latter circumstances the judgment in favor of the plaintiff for loss of earnings would be reduced to the extent that the corporations paid him for services rendered instead of making a gift to him.

torney's fees in appropriate cases both in the trial courts and in this Court is salutary, and as indicated in recent cases we propose to enforce it vigorously. However, in view of the somewhat novel legal questions involved herein, we are unable to say that the trial court abused its discretion in not awarding attorney's fees in this case.

The provision of the judgment awarding $7,800 to the plaintiff will be affirmed, and the case will be remanded for further proceedings consistent with this opinion on the issue of damages for loss of earnings.

Mr. Justice Belaval concurs in the result